OPINION
This appeal stems from a dispute over management and control of a four hundred and two unit apartment complex in Northwest Columbus, known as Fox Hounds. Plaintiffs-appellants, cross-appellees, Walter A. Thomas, M.D. et al., are a group of limited partners in Fox Hounds Ltd. (the "investor partnership"). Defendants-appellees, cross-appellants, CIMCO Development Ltd. ("Cimco"), Live Oak Properties, Ltd., RMS Properties Corp., and RMS Rentals, Inc. ("RMS"), Fox Hounds Ltd., and Fox Hounds Joint Venture are all entities controlled by defendant-appellee Robert Shaevitz.
In 1970, George Deffet, through his company Deffet Rentals, Inc., formed a limited partnership, Deffet-Fox Hounds, Ltd. Deffet sold limited partnership units to fund the development of Fox Hounds Apartments. Appellants are some of those original limited partners. The Limited Partnership Agreement ("LPA") provided that the limited partners "shall have a first right, in proportion to their capital contribution, to net profits * * * of the partnership, in an amount equal to ten percent (10%) per annum of their total capital contributions called and paid." ("first rights payments".) (Shaevitz Affidavit, Exhibit F; LPA at section 2.2.)
By 1974, the project was in foreclosure and Shaevitz, through Cimco, lent $250,000 to the investor partnership. A joint venture was formed between Cimco and the investor partnership. Under the terms of a joint venture agreement ("JVA"), Cimco became the managing partner and received a fifty-five percent interest in the joint venture and the investor partnership received a forty-five percent interest. After Shaevitz and his entities took control over the project at the end of 1974, the first rights payments owed limited partners under the LPA were stopped.
In the course of managing the joint venture, Cimco, on behalf of the joint venture, entered into management and maintenance agreements with RMS and related entities. The JVA provided that Cimco could deal with related parties or entities provided there was full disclosure and the prices or fees paid were competitive with those charged by unrelated parties under similar circumstances. The property manager's salary was paid directly by the project. The resident manager's salary was paid directly by the project. In addition, RMS received a management fee based on a percentage of the gross receipts for managing the property. Shaevitz, through Cimco, also received a fee for managing the joint venture based on a percentage of the gross receipts. Over the years from 1974 to 1994, RMS received increases in the partnership management fee. The increases were requested by Shaevitz as a representative of RMS and approved on behalf of the joint venture by Shaevitz on behalf of Cimco. RMS also imposed an additional charge of ten-to-twenty percent on fees charged by subcontractors who provided services to Fox Hounds.
In 1989, Cimco discovered that between 1983 and 1989, an employee of RMS, Frances Newman, had embezzled $595,000 from the joint venture. Upon discovering the embezzlement, Cimco and RMS pursued Newman's criminal conviction and successfully recovered a portion of the embezzled funds against National City Bank, where Newman had deposited some of the embezzled funds over restrictive endorsements.
In the years that followed the creation of the joint venture, disputes developed between Cimco and Deffet, the general partner of the original investor partnership. Deffet claimed he was owed $740,969 for cost overruns in the initial development of the project. In an effort to resolve the disputes, Cimco, RMS, Deffet, the joint venture, and the investor partnership entered into a settlement. As part of the 1986 settlement, Deffet received $200,000 and assigned to RMS his share of the profits and losses in the investor partnership and his right to receive partnership assets. The parties agreed that RMS would be substituted for Deffet as general partner of the investor partnership if and when the investors, i.e., the limited partners, approved the substitution. A sufficient number of investors did not consent to the substitution of RMS as general partner until July of 1993.
When RMS became general partner of the investor partnership, it had the project appraised showing the value of the project to be $9,900,000 and the investor partnership's forty-five percent interest in the joint venture at $1,490,400. In 1994, RMS sold the assets of the joint venture to Live Oak Properties, Ltd., another entity controlled by Shaevitz. Fox Hounds Joint Venture presently owns Fox Hounds Apartments. Fox Hounds Joint Venture is a partnership made up of Cimco and Live Oak Properties, Ltd.
Appellants brought claims of breach of contract, breach of fiduciary duty, negligence, conversion, and fraud. Appellants claimed that appellees: (1) overcharged for services relating to the management and maintenance of the apartment project; (2) failed to distribute guaranteed first rights payments to the investors; (3) sold the project to an entity controlled by appellee Shaevitz and denied appellants the opportunity to continue their participation in the project; and (4) managed the project in a way that allowed an employee to embezzle over $595,000 over a six-year period.
Appellees moved for summary judgment as to all the claims. While the motion for summary judgment was pending, appellants sought and were granted leave to amend their complaint to reflect that they were bringing their claims both derivatively and individually. The trial court granted the motion for summary judgment in a decision and entry dated September 29, 1998. In large part, the trial court granted the motion for summary judgment on the grounds that appellants failed to provide competent evidence rebutting the evidence provided by appellees in support of their summary judgment motion.
On appeal, appellants have asserted six assignments of error:
 ASSIGNMENT OF ERROR NO. 1: The trial court erred in granting summary judgment because when a party's affidavit is contradicted by his deposition, there exists questions of credibility that must be resolved by the jury.
 ASSIGNMENT OF ERROR NO. 2: The trial court erred in granting summary judgment because issues of material fact remained to be litigated as to whether defendants breached their fiduciary and contractual obligations.
 ASSIGNMENT OF ERROR NO. 3: The trial court erred in granting summary judgment on the contract claims because those claims presented questions of fact.
 ASSIGNMENTS OF ERROR NO. 4: The trial court erred in granting summary judgment because there is evidence that defendants breached their fiduciary duties.
 ASSIGNMENT OF ERROR NO. 5: The trial court erred in granting summary judgment because there was a factual dispute as to defendants' liability for the misconduct of their employee.
 ASSIGNMENT OF ERROR NO. 6: The trial court erred in granting summary judgment because defendants failed to satisfy the standard for summary judgment.
With respect to appellants' contention that summary judgment was improperly granted, Civ.R. 56(C) states that summary judgment shall be rendered forthwith if:
 * * * [T]he pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. * * *
Accordingly, summary judgment is appropriate only where: (1) no genuine issue of material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party. Tokles Son, Inc.v. Midwestern Indemn. Co. (1992), 65 Ohio St.3d 621, 629, citingHarless v. Willis Day Warehousing Co. (1978), 54 Ohio St.2d 64,65-66. "[T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record before the trial court which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." Dresher v. Burt
(1996), 75 Ohio St.3d 280, 292. Once the moving party meets its initial burden, the nonmovant must then produce competent evidence showing that there is a genuine issue for trial. Id.
Appellate review of summary judgments is de novo. Koos v.Central Ohio Cellular, Inc. (1994), 94 Ohio App.3d 579, 588;Midwest Specialties, Inc. v. Firestone Tire Rubber Co. (1988),42 Ohio App.3d 6, 8. We stand in the shoes of the trial court and conduct an independent review of the record.
In their first assignment of error, appellants assert that Shaevitz's deposition contradicts his affidavit in numerous respects. If true, and the contradictions are material to the issues, such contradictions could form the basis for denying a motion for summary judgment. In Turner v. Turner (1993), 67 Ohio St.3d 337, paragraph one of the syllabus, the Ohio Supreme Court held:
 When a litigant's affidavit in support of his or her motion for summary judgment is inconsistent with his or her earlier deposition testimony, summary judgment in that party's favor is improper because there exists a question of credibility which can be resolved only by the trier of fact.
Here, appellants take issue with Shaevitz's assertions in his affidavit that: (1) the duty to pay first rights payments was modified by a 1975 letter; (2) he was not involved in Newman's embezzlement; (3) the fees charged by his related entities were reasonable; (4) that he complied with the terms of the JVA and LPA and managed the project in the best interests of the joint venture and investor partnership.
While appellants have identified numerous areas in which they disagree with Shaevitz's characterization of the facts, appellants have failed to point to any specific statements in Shaevitz's affidavit that are controverted by his earlier deposition testimony. For example, Shaevitz asserted in his affidavit that he believed charges for services were reasonable. Appellants point to the portion of his deposition in which Shaevitz admitted that he added an additional ten-to-twenty percent to the cost of services performed at Fox Hounds. While this testimony may create an issue of fact concerning the reasonableness of the charges, it does not contradict the affidavit. Similarly, in the other matters where appellants assert contradictions, appellants have failed to point to any specific language where the deposition testimony contradicts the affidavit. Rather, appellants disagree with what can be inferred from Shaevitz's testimony. These arguments are more properly addressed in the remaining assignments of error. Thus, Turner is inapplicable, and the first assignment of error is not well-taken and is overruled.
In assignments of error two, three, four, and five, appellants argue that construing the evidence in a light most favorable to them, genuine issues of material fact remain. As discussed above, the factual disputes fall into four categories: (1) overcharging for services relating to the management and maintenance of the apartment project; (2) failing to distribute guaranteed first rights payments to the investors; (3) managing the project in a way that allowed an employee to embezzle over $595,000 over a six-year period; and (4) selling the project to an entity controlled by appellee Shaevitz and denying appellants the opportunity to continue their participation in the project. We shall address each of these contentions in turn.
With respect to overcharging, Shaevitz asserted that the services provided by his related entities were always bid out as required by the JVA and by HUD who financed the project. It was Shaevitz's opinion that the fees charged were always reasonable and HUD always approved the operation through its audits. Dealing with related entities was permitted by paragraph 8 of the JVA. Moreover, Larry Stemen, the accountant for appellees, testified in his deposition that based on his experience as an accountant for various apartment complexes, the expenses were reasonable.
Appellants, on the other hand, point out that there is no provision in the JVA for a ten-to-twenty percent surcharge for expenses incurred in managing the apartment complex, and that self-dealing was permitted by the JVA, only if the fees paid were competitive with those charged by unrelated parties under similar circumstances. Appellants also point to Shaevitz's admission that he could have hired someone to manage the project for $100,000 instead of Shaevitz's $180,000 salary. Appellants also note that if HUD made a determination of superior performance, management fees could be increased. Fox Hounds never received a rating of superior, yet Shaevitz continued to increase his management fees.
Construing this evidence in a light most favorable to appellants, we find appellants have demonstrated the existence of a genuine issue of material fact as to whether appellees overcharged for management and maintenance of the project contrary to the express provision in the JVA. (JVA at section 8.)
With respect to the first rights payments, Shaevitz asserted that at the time he became the general partner, the duty to pay first rights payments had been modified by a letter written by Deffet in January of 1975. The letter provided in relevant part:
 If you were present on December 17th, [a meeting of the Deffet-Fox Hounds Limited Partnership] you also know that we, as General Partner, are not in a position to fund the First Rights Payment as we have done for the past two years even though the project was operating at a loss. Consequently, you should not expect future cash distributions until they can be supported by the project. [Shaevitz affidavit, Exhibit B.]
In his affidavit, Shaevitz claims that after the letter, the project never had surplus cash to distribute first rights payments. (Shaevitz affidavit, paragraph 17.)
Appellants admitted to the trial court that the Deffet letter modified the LPA. "Plaintiffs agree that the LPA was modified." (Plaintiffs' Memo Contra to defendants' Motion for Summary Judgment at 19.) See, also, p. 17 ("The LPA was modified as evidenced by George Deffet's January 24, 1975 letter."). Now, for the first time on appeal, appellants argue that the modification was not supported by consideration and that all the limited partners did not sign it as required by the LPA. Appellants direct our attention to paragraph 9.4 of the LPA, which provides:
 No changes, alterations, modifications, additions, or qualifications to the terms of this Agreement shall be made or be binding unless made in writing and signed by each of the parties.
Appellees have identified no writing signed by appellants modifying the first rights payments under the LPA.
However, by admitting that the 1975 letter modified the LPA, appellants are estopped from now arguing for the first time on appeal that the modification was not supported by consideration and was not signed by all the parties. If the trial court erred in granting summary judgment based on a modification to the LPA, certainly appellants invited the error when they admitted to the trial court that the letter modified the LPA. Under the "invited error" doctrine, a party will not be permitted to take advantage of an error which he himself invited or induced the trial court to make. Lester v. Leuck (1943), 142 Ohio St. 91, paragraph one of the syllabus.
Appellants further contend that genuine issues of material fact exist concerning Shaevitz's assertion that he had no involvement in the embezzlement by Frances Newman. In support of this assertion, appellants rely upon an unsworn sentencing memorandum filed by Newman's attorney in the criminal matter. Appellants also rely on a portion of the deposition of Shaevitz that was "sealed" by the parties. The sealed deposition was not properly made part of the record before the trial court, and the sentencing memorandum does not fall within any of the permissible or admissible evidence under Civ.R. 56. The only admissible evidence in the record consists of Shaevitz's denial of any involvement in the embezzlement. Therefore, summary judgment was appropriate with respect to the claims concerning appellees' involvement in the embezzlement.
Finally, appellants allege factual issues remain as to whether appellee Shaevitz breached his fiduciary duties and improperly used his control to "squeeze the remaining limited partners out of the project, by selling the apartment complex to one of his related entities, Live Oak Properties, Ltd." (Brief of appellants at 5.) Appellants contend that Shaevitz bought out the remaining limited partners because he wanted control of the project. Even if Shaevitz did want to control the project, appellees contend the issue is moot, as the evidence is uncontroverted that appellants could not have received a better price for the sale of the project. In Shaevitz's affidavit he states that the sale to Live Oak brought more money to the limited partners than the sale Deffet desired to make to a third party for $10,750,000. The sale resulted in appellants receiving $1,013,341 for their partnership interest or $6,756 per partnership unit.
Appellants have directed us to Shaevitz's deposition in which he states the asset was worth $11,000,000. (Shaevitz depo. at 77.) Yet the appraisal upon which Shaevitz relied in selling the asset valued the property at $9,900,000. (Shaevitz affidavit at paragraph 18.) This $1.1 million discrepancy over the value of the asset is enough to create a genuine issue of material fact concerning the fair market value of the asset. Moreover, the appraiser was instructed to value the project on the basis of income remaining after reduction for expenses. As we have discussed previously, these expenses were determined by appellees, and genuine issues of material fact exist with respect to the legitimacy of the management and maintenance fees. Construing the evidence most strongly in favor of appellants, reasonable minds could reach the conclusion that appellees breached their fiduciary duty and their duty under the LPA and sold the partnership asset to a related entity for less than its fair market value. Accordingly, summary judgment was inappropriate with respect to the claims dealing with the sale of the partnership assets to Live Oak.
In summary, we find that genuine issues of material fact exist with respect to alleged overcharging for management and maintenance of the project and services and the sale of the partnership asset to Live Oak. The third and fourth assignments of error are therefore sustained to the extent appellants have stated claims concerning the overcharging for services, and the sale of the asset to an entity controlled by appellees. The remaining arguments in the second, third, fourth, and fifth assignments of error are not well-taken and are overruled.
Finally, in their sixth assignment of error, appellants claim appellees failed to satisfy the standard for summary judgment. Appellants argue that as fiduciaries, appellees have the burden to prove that all of their transactions were fair. Appellants have misconstrued the holding of Dresher, supra. As discussed above, appellees fulfilled their initial burden of "informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims." Dresher, supra, at 293. Once appellees met their initial burden, appellants then had the burden to "produce competent evidence showing that there is a genuine issue for trial." Id. With the exception of the claims concerning alleged overcharges, appellants have failed to meet their burden. The sixth assignment of error is not well-taken and is overruled.
Defendants-appellees/cross-appellants ("appellees") have filed a cross-appeal asserting three assignments of error:
 I. The trial court erred in denying defendants' motion to strike the affidavit of Matthew Jorgensen when such affidavit was filed after the hearing date on defendants' motion for summary judgment.
 II. The trial court abused its discretion in denying defendants' motion for attorneys' fees incurred in connection with filing defendants' motion to strike plaintiffs' supplemental memorandum contra to defendants' motion for summary judgment when plaintiffs' [sic] had repeatedly made out-of-rule filings.
 III. The trial court erred in granting plaintiffs' motion for leave to amend their complaint when such motion was untimely and the derivative claims asserted in such amended complaint were barred by R.C. § 1782.57.
In their first cross-assignment of error, appellees argue that the trial court abused its discretion in denying their motion to strike the affidavit of Matthew Jorgensen because the affidavit was untimely. Loc.R. 57 provides that all motions for summary judgment are set for non-oral hearing on the 28th day following the filing of the motion for summary judgment. Evidentiary materials filed in opposition to the motion for summary judgment are to be filed prior to the day set for the non-oral hearing on the motion. Here, the affidavit was not filed until January 28, 1998, more than two months after appellees filed their motion for summary judgment. However, neither of the parties established a new non-oral hearing date after the parties agreed to extensions for the filing of the memorandum contra and the reply memorandum. The trial court was within its discretion when it established a new non-oral hearing date and denied the motion to strike given that the parties had not established a new non-oral hearing date. The first cross-assignment of error is not well-taken and is overruled.
In their second cross-assignment of error, appellees assert the trial court abused its discretion in not awarding attorney fees in connection with a motion to strike. Appellees contend that they waited until appellants' third out-of-rule filing before requesting attorney fees, and that they should have been granted attorney fees because of appellants' repeated out-of-rule filings, even after being admonished by the magistrate.
The trial court's ruling against attorneys' fees was made in connection with granting a motion to disqualify appellants' counsel. In so doing, the trial court recognized that appellees were burdened by the expense of preparing a motion to strike, but that in light of the sanction of disqualification, the trial court elected to deny the motion for attorneys' fees.
A decision to award attorneys' fees in connection with a motion to strike is within the sound discretion of the trial court. State ex rel. Fant v. Sykes (1987), 29 Ohio St.3d 65. Here, in an effort to be fair to both sides, the trial court elected to balance certain equities in relationship to the disqualification of appellants' attorney. Such a determination was within the discretion of the trial court and, accordingly, the second cross-assignment of error is not well-taken and is overruled.
In their third cross-assignment of error, appellees claim the trial court erred in granting appellants leave to amend their complaint. Appellees argue the motion should have been denied, as it was untimely. Appellants' motion sought leave of the trial court to amend their complaint to reflect that appellants were bringing their claims derivatively as well as individually. Appellees contend that the case had been pending for three and one-half years and that a motion for summary judgment was pending before the court. Appellees argue that appellants sought leave to amend their complaint only after they raised the issue of standing in their motion for summary judgment. Appellees further claim that permitting the amendment violated R.C. 1782.57 which provides:
 * * * [T]he plaintiff shall be a person who is a partner of the limited partnership at the time of the filing of the complaint in the action or a person who was a partner of the limited partnership within one year prior to the date of the filing of the complaint in the action. * * *
In this case, appellants sought to assert derivative claims for the first time four years after their limited partnership interests had been purchased.
The trial court granted the motion with respect to permitting appellants to bring their claims derivatively but denied appellants leave to amend their prayer. The trial court reasoned that leave should be granted because new counsel had only recently entered the case after appellants' previous counsel was disqualified. The trial court further found that appellees would not suffer hardship as the amendment was merely technical and granting leave to amend was in line with the principle that cases should be tried on their merits and not disposed of on pleading deficiencies. The trial court additionally noted that the discovery deadline had been extended and that the trial had been delayed until October 19, 1998, because of the "uniqueness of the situation concerning counsel's disqualification." (Journal Entry of June 25, 1998, granting in part and denying in part plaintiffs' Motion to Amend Their Complaint.)
An appellate court will only reverse a trial court's decision on a motion to amend a complaint if the trial court abused its discretion. Brannan v. Fowler (1995), 100 Ohio App.3d 577,581. The language of Civ.R. 15(A) favors a liberal amendment policy and the granting of a motion for leave to amend should not be disturbed on appeal absent a finding of bad faith, undue delay, or undue prejudice to the opposing party. Hoover v. Sumlin
(1984), 12 Ohio St.3d 1, paragraph two of the syllabus.
Here, the motion for leave to amend was filed on May 1, 1998, just four days after new counsel entered an appearance. The trial court considered both the earlier disqualification of counsel and the potential prejudice to appellees and concluded that a technical amendment at that stage of the litigation would not result in harm to appellees especially given the extension of the trial date. We find no abuse of discretion in this regard.
We also find that appellees' assertion that the amended complaint is barred by the one-year time limit in R.C. 1782.57
overlooks the provisions of Civ.R. 15(C). Civ.R. 15(C) provides that when a new claim asserted in an amended complaint arose out of the conduct, transaction, or occurrence set forth in the original complaint, the amendment relates back to the date of the original pleading. Thus, appellants' amendment seeking to change the capacity in which they were bringing suit relates back to the date of the original complaint. See Wood v. Worachek (C.A.7, 1980), 618 F.2d 1225, 1229 (a plaintiff may usually amend his complaint under Fed.R.Civ.P. 15[c] to change the capacity in which the plaintiff sues); In re Westinghouse Securities Litigation
(W.D. Pa. 1993), 832 F. Supp. 989, 999 (claims of derivative plaintiffs relate back to under Fed.R.Civ.P. 15[c][2] to the date of the original pleading). The third cross-assignment of error is not well-taken and is overruled.
Based on the foregoing, we overrule appellants' first, second, fifth, and sixth assignments of error, and sustain, in part, the portions of the third and fourth assignments of error pertaining to alleged overcharging for services and sale of the partnership asset. We overrule appellees/cross-appellants three cross-assignments of error and remand the matter to the Franklin County Court of Common Pleas for further proceedings in accordance with this opinion.
Judgment sustained in part, reversed in part; cause remanded.
PETREE and BROWN, JJ., concur.